**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 15-cv-02236-WJM-CBS
Bankruptcy Case No. 13-27310-TBM
Adversary Proceeding No. 15-01240-TBM

IN RE:
SAMUEL JESSE CHRISTIAN MORREALE

TOM H. CONNOLLY, Chapter 7 Trustee,

    Plaintiff,

v.

CARRIE PALMER, and
SKETCH RESTAURANT, LLC,

    Defendant.

---

## ORDER DENYING DEFENDANT'S MOTION FOR WITHDRAWAL OF THE REFERENCE

---

Before the Court is a Motion for Withdrawal of the Reference (ECF No. 2) filed by Carrie Palmer ("Palmer"), who is the defendant in a recently filed Bankruptcy Court adversary proceeding. Palmer argues that the causes of action asserted against her in the adversary proceeding are those for which a jury trial is guaranteed under the Seventh Amendment. The adversary proceeding plaintiff, Tom H. Connolly ("Connolly"), opposes Palmer's motion. (ECF No. 4.) Connolly is the Chapter 7 trustee for the bankruptcy estate of Samuel Jesse Christian Morreale ("Morreale"), and the adversary proceeding seeks to recover assets for that estate. On October 23, 2015, Palmer's co-defendant in the adversary proceeding, Sketch Restaurant, LLC, joined in the motion. (ECF No. 9.)

For the reasons stated below, Palmer's motion is denied.

## I. BACKGROUND

Connolly's adversary proceeding complaint revolves around Sketch Restaurant, LLC ("Sketch"), a business entity that operated two restaurants in Denver. (ECF No. 2 at 7.) According to Connolly, Sketch was formed and 100% owned by Morreale. (*Id.*) On October 9, 2013, however, Morreale's attorney prepared "draft documents for the purpose of admitting Palmer [Morreale's then-fiancée] as a member of Sketch." (*Id.* at 6–7.) Morreale's attorney "mailed the draft documents to Morreale" on the same day but "does not know if the documents were ever signed." (*Id.* at 7.)

Morreale filed his personal bankruptcy case on October 15, 2013. (*Id.*) On his bankruptcy schedules, Morreale stated that his Sketch ownership interest was 70.13%, rather than 100%. (*Id.*) Connolly asserts that one of two things must have happened: (1) Morreale never actually transferred Sketch membership interests to Palmer, meaning that his bankruptcy estate "remains and is the 100% equity owner of Sketch"; or (2) Morreale indeed transferred a 29.87% interest to Palmer, and that transfer is invalid as actually or constructively fraudulent under the Bankruptcy Code. (*Id.* at 8.)

Connolly's claims for relief against Palmer are as follows:

1. declaratory judgment that the Morreale bankruptcy estate is Sketch's 100% equity owner;

2. actual fraudulent transfer under the Bankruptcy Code, 11 U.S.C. § 548(a)(1)(A);

3. constructive fraudulent transfer under the Bankruptcy Code, 11 U.S.C. § 548(a)(1)(B);

4. actual fraudulent transfer under the Colorado Uniform Fraudulent Transfer Act ("UFTA"), Colo. Rev. Stat. § 38-8-105(1)(a); and

5. constructive fraudulent transfer under the UFTA, Colo. Rev. Stat. § 38-8-105(1)(b).

(*Id.* at 8–11.) For each of the fraudulent transfer claims, Connolly requests a judgment: (a) declaring the transfer null and void under 11 U.S.C. § 548(a)(1)(B), which permits a trustee to avoid certain transfers made within two years before the filing of the bankruptcy petition; and (b) authorizing Connolly to recover the membership interests transferred to Palmer under 11 U.S.C. § 550(a), which permits a trustee to recover transferred property when the transfer is avoided under § 548.

## II. ANALYSIS

Pursuant to 28 U.S.C. § 157 and D.C.COLO.LCivR 84.1(a), bankruptcy cases (including adversary proceedings) are automatically referred to the Bankruptcy Court. But, for cause shown in a timely motion, this Court may withdraw that reference. 28 U.S.C. § 157(d). The "cause" Palmer asserts here is that she never filed a claim against the Morreale bankruptcy estate and never otherwise consented to the Bankruptcy Court's jurisdiction, so she claims a Seventh Amendment right to a jury trial on Connolly's fraudulent transfer causes of action. (ECF No. 2 at 1–2.) *See also* U.S. Const. amend. VII ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."). Because the

Bankruptcy Court cannot hold a jury trial, *see In re Kaiser Steel Corp.*, 911 F.2d 380, 392 (10th Cir. 1990), Palmer argues that this Court must withdraw the reference and assume traditional jurisdiction over Connolly's adversary proceeding. (*Id.*)[1]

Palmer's argument and Connolly's response both turn on *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989). *Granfinanciera*, like this case, involved an adversary proceeding alleging fraudulent transfer. *Id.* at 36. Unlike this case, however, the allegedly fraudulently transferred asset was cash, not shares of a business. *Id.* The primary question facing the Supreme Court was whether the Seventh Amendment guaranteed a jury trial to the adversary proceeding defendant on the fraudulent transfer claim. *Id.* at 37–38.

The Supreme Court set forth a three-part test for answering that question. First, a court must "compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity." *Id.* at 42 (internal quotation marks omitted). Second, the court must "examine the remedy sought and determine whether it is legal or equitable in nature." *Id.* "If, on balance, these two factors indicate that a party is entitled to a jury trial under the Seventh Amendment," then the court "must decide whether Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as a factfinder." *Id.*

---

[1] Palmer does not argue that Connolly's state-law fraudulent transfer claims require this Court to withdraw the reference even if Connolly's Bankruptcy Code fraudulent transfer claims do not. Palmer argues only that fraudulent transfer claims, of whatever variety, must be tried to a jury if the defendant so demands and has not consented to Bankruptcy Court jurisdiction. (*See generally* ECF No. 5.)

Applying the first part of this test, the Supreme Court found "no dispute that actions to recover preferential or fraudulent transfers were often brought at law in late 18th-century England." *Id.* at 43.  The Court agreed with the adversary proceeding plaintiff's "assertion that courts of equity sometimes provided relief and fraudulent conveyance actions," but that "hardly suffice[d] to undermine [the defendants'] submission that the present action for *monetary* relief would not have sounded in equity 200 years ago in England."  *Id.* (emphasis in original).

The Supreme Court elaborated on this distinction (monetary versus equitable relief) at some length.  The Court particularly emphasized the following passage from a treatise:

> "[W]hether the trustee's suit should be at law or in equity is to be judged by the same standards that are applied to any other owner of property which is wrongfully withheld.  If the subject matter is a chattel, and is still in the grantee's possession, an action in trover or replevin would be the trustee's remedy; and if the fraudulent transfer was of cash, the trustee's action would be for money had and received.  Such actions at law are as available to the trustee to-day as they were in the English courts of long ago.  If, on the other hand, the subject matter is land or an intangible, or the trustee needs equitable aid for an accounting or the like, he may invoke the equitable process, and that also is beyond dispute."  1 G. Glenn, Fraudulent Conveyances and Preferences § 98, pp. 183–184 (rev. ed. 1940) (footnotes omitted).

*Id.* at 44.  The Court characterized this summary as "compel[ling] the . . . conclusion" that "suits to recover an allegedly fraudulent transfer of money" were never considered appropriate for courts of equity.  *Id.*; *see also id.* at 44–47 (discussing cases in which the English Court of Chancery refused to exercise jurisdiction over fraudulent transfer claims where the plaintiff sought to recover money).

5

Moving on to the second part of the three-part test, the Supreme Court concluded that the adversary proceeding plaintiff was seeking a legal rather than an equitable remedy. *Id.* at 47–49. The Court was particularly persuaded by one of its prior decisions holding that a bankruptcy trustee seeking to recover preferential payments could not sue in equity because the trustee had a complete remedy at law. *Id.* at 48–49 (analyzing *Schoenthal v. Irving Trust Co.*, 287 U.S. 92 (1932)).

The Supreme Court then went on to the third part of its test, but this Court need not recount that analysis because Connolly's and Palmer's respective arguments turn exclusively on parts one and two. Connolly points out that his adversary proceeding complaint does not seek money damages, but rather a return of whatever Sketch membership interests were transferred to Palmer. (ECF No. 4 ¶¶ 1, 9.) Connolly further notes the above-quoted passage from the Glenn treatise cited in *Granfinanciera*, and particularly the final sentence: "***If, on the other hand, the subject matter is land or an intangible***, or the trustee needs equitable aid for an accounting or the like, ***he may invoke the equitable process, and that also is beyond dispute.***" (*Id.* ¶ 8 (emphasis added by Connolly).)

Connolly then cites several cases analyzing *Granfinanciera* and concluding that the right to a jury trial on a fraudulent transfer claim brought in Bankruptcy Court turns on whether the plaintiff seeks monetary or equitable relief. *See In re Palm Beach Fin. Partners, L.P.*, 501 B.R. 792, 798 (Bankr. S.D. Fla. 2013) ("[T]he *Granfinanciera* Court noted that although courts of equity sometimes had concurrent jurisdiction with courts of law over fraudulent transfer actions in 18th century England, when the relief sought

by the plaintiff in a fraudulent transfer action was solely monetary, courts of equity never had jurisdiction over the action. . . . [¶] Here, all four of the Plaintiff's causes of action are fraudulent transfer actions which seek purely monetary relief."); *In re Term Indus., Inc.*, 181 B.R. 31, 32 (Bankr. S.D.N.Y. 1995) ("In *Granfinanciera*, however, the Supreme Court made it quite clear that whether an action for fraudulent conveyance requires a jury trial depends upon the subject matter of the action."); *In re Stocks*, 137 B.R. 516, 521 (Bankr. N.D. Fla. 1991) ("The opinion in *Granfinanciera* is abundantly clear that the Court focused on the fact that the remedy sought the recovery of money."); *In re Aichinger*, 2015 WL 790536, at *1 (D. Colo. Feb. 23, 2015) ("In this case, the Seventh through Tenth claims for relief all seek the recovery of a definite sum of money: $523,892.47.  Therefore, these claims are legal in nature and give rise to the Seventh Amendment right to a jury trial." (citation omitted)); *In re Babcock & Wilcox Co.*, 2001 WL 725318, at *4 (E.D. La. June 26, 2001) ("*Granfinanciera* dealt with a fraudulent conveyance claim involving transfers of specific and determinate amounts of money.  The Court found that such an action would have been an action at law in eighteenth century England.  Notably, the Court distinguished actions to recover fraudulent transfers of tangible property from those to recover intangible property . . . ." (citations omitted)).

      Finally, Connolly emphasizes that the decisions which have addressed fraudulent transfer of corporate membership interests (such as the LLC membership interests Connolly seeks from Palmer) have all held that the action was equitable, not legal.  *Term Indus.*, 181 B.R. at 33 ("[The] Committee's fraudulent conveyance action is

an equitable action because its subject matter is shares of stock, an intangible."); *Stocks*, 137 B.R. at 522 ("Sunset prays for this court to enter an order determining that the 40% interest in Sunset was the property of Stocks on the date of the filing of the petition and, therefore, is property of the bankruptcy estate . . . . Additionally, Sunset asks this court to set aside and declare null and void the transfer, by Stocks to SFT, of Stocks' interest in Sunset. Sunset seeks an equitable remedy, therefore, SFT is not entitled to a jury trial."); *Babcock & Wilcox*, 2001 WL 725318, at \*5 ("The assets at issue are the stock of B & W's former subsidiaries . . . and a promissory note . . . . Stock and notes are intangibles. Hence, this is the type of fraudulent conveyance action that would have required a court of equity in eighteenth century England."). Thus, says Connolly, his action against Palmer is equitable and not within the Seventh Amendment jury trial right.

Palmer responds that these cases "were wrongly decided." (ECF No. 5 at 2.) But Palmer does not cite any contrary authority. She argues only that "[t]here is no logical or reasonable distinction, for the purpose of determining one's right to a jury trial, between an action for the fraudulent conveyance of dollar bills and an action for the fraudulent conveyance of stock certificates." (*Id.*) However, given that *Granfinanciera* specifically requires courts to determine whether an action was considered legal or equitable in nature in 18th-century England, as well as traditionally in the United States, the relevant inquiry is historical, not logical—however odd the history may be. Palmer has not offered any history to undermine *Granfinanciera*'s distinction between the

treatment of monetary claims versus other claims.[2]

Given this, and given the many as-yet-uncontradicted authorities concluding that non-monetary claims such as Connolly's were traditionally considered equitable, the Court holds that Palmer has no right to a jury trial on Connolly's fraudulent transfer claims.

### III. CONCLUSION

For the reason stated set forth above, Palmer's Motion for Withdrawal of the Reference (ECF No. 2) is DENIED. The Clerk shall terminate this case.

Dated this 26th day of October, 2015.

BY THE COURT:

William J. Martinez
United States District Judge

---

[2] In truth, neither Palmer nor Connolly offers any real historical analysis. The cases cited by Connolly assume that *Granfinanciera* established as a matter of historical fact that non-monetary fraudulent transfer claims were considered equitable in 18th-century England. *Granfinanciera* actually held that *monetary* claims were *not* equitable, which does not compel the conclusion that all *non-monetary* claims *were* equitable. Nonetheless, *Granfinanciera*'s historical analysis strongly suggests that this monetary/non-monetary distinction is highly relevant. Absent anything more from the parties, this Court must assume, as in the decisions Connolly cites, that *Granfinanciera* provides sufficient historical background to conclude that fraudulent transfer claims for non-monetary assets should be considered equitable.